IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO. 8:21-cv-01319-SDM-JSS

LINDA FARHAT,
*individually and on behalf of all others similarly situated*,

    Plaintiff,

vs.

UNIQUE HEALTHCARE SYSTEMS, LLC d/b/a AFC URGENT CARE PINELLAS PARK,

    Defendant.
_____/

**CLASS ACTION**

**JURY TRIAL DEMANDED**

## FIRST AMENDED CLASS ACTION COMPLAINT[1]

Plaintiff Linda Farhat brings this class action against Defendant Unique Healthcare Systems, LLC d/b/a AFC Urgent Care Pinellas Park, and alleges as follows upon personal knowledge as to Plaintiff and Plaintiff's own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by Plaintiff's attorneys.

### NATURE OF THE ACTION

1. This is a putative class action under the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq*., ("TCPA"), and its implementing regulations.

---

[1] Plaintiff hereby amends her Complaint pursuant to Rule 15(a)(1)(B) thereby mooting Defendant's Motion to Dismiss, [DE 9].

2. At the start of the COVID-19 pandemic, the Federal Communications Commission warned companies like Defendant that telemarketing made under the guise of offering purportedly "free" COVID-19 related services would not be tolerated and that such calls would be considered violations of the TCPA. *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling, 35 FCC Rcd. 2840 (2020).

3. Undeterred, Defendant launched a bait-and-switch text message campaign purporting to offer "free" COVID-19 testing and antibody testing. As many consumers learned, there was no "free" testing, and Defendant would typically demand payment of $130.00 per test, claiming that the consumers' insurance did not cover the testing.

4. Several consumers who fell for Defendant's scheme voiced their complaints on the Internet, including the following:

> **R R.**: Where to begin...I went to AFC Urgent care to get a Covid-19 test that I needed in order to have surgery. Their website says, FREE Covid testing for insured AND uninsured. When I was called to the front desk, after waiting outside in a line for 4 hours (yes,4!), I was told I had to pay $130 for the Covid test. I am insured, but apparently my company is not included on their list. Regardless, I was told FREE. I went ahead and paid because I needed to get the test done, and I had already waited 4 hours. When I checked in, I asked them how long it would take to get the test results back. The gentleman told me up to 72 hours. I was happy about that because I needed the results back by 5 days. Their website also claims rapid results. So, I waited an additional 2 hours to be tested! I asked the nurse as to how/when to get my results, and she said, 3-9 days! 3-9 days is not the same as up to 3 days. I would not have stayed and done the test there if I would have known that. Now I

may have to reschedule surgery and get re-tested. Conclusion: 1)Waited 6 hours to get tested 2)Had to pay $130 for a "free' test 3)May not get results in time.

*   *   *

**Laura D.**: Took my mom there for a "free" COVID test. Was originally told they did not take her insurance, but later received apologies from two staff members who said they were mistaken. They said that her co-pay was $20 and I would receive credit for $110 because I had paid $130. The credit should have posted in days. Now it has been weeks and neither the billing department nor the location has resolved. Fortunately my mom is fine. However, I will never take her there again and would not recommend.

*   *   *

**Elizabeth H.**: When we arrived dozes of people standing around in and out waiting for the "free" Covid test. Well they give priority to the people with insurance (so they can bill your insurance for this Free test" or who are willing to pay $100.00 for the not "free" rapid test....[2]

**Brad Rouse**: I received a rapid Covid test on December 28 2020 at the Unique Healthcare Systems, Pinellas Park. It was a miserable experience, where I waited in line for at least an hour or more, before I was given a "reservation" to return later that evening for the test. When I returned at the "reservation "time, I was asked for my Medicare information, which I gave. I was then told that the test was not covered by any insurance, including Medicare, so it would cost $100. I gave them my credit card, which was charged $100. I just received my Medicare statement covering that period. Medicare paid them $137.49. I am owed $100 for my visit, and I cannot get anyone to return my call regarding reimbursement for my services. I WOULD ADVISE ANYONE SEEKING MEDICAL CARE TO STAY AWAY FROM THIS PLACE!!![3]

---

[2] www.yelp.com/biz/afc-urgent-care-seminole-seminole; (last visited on Jan. 5, 2021).

[3] www.google.com review of Unique Healthcare Systems (last visited on July 7, 2021).

5. In a recent article entitled *Urgent Care Business Resilient During Pandemic*, the owner of sister facilities in Clearwater and Citrus Park openly discussed how COVID-19 testing has been a profit center during the pandemic for urgent care facilities like Defendant: "'We kind of hunkered down for about a month and then things started picking back up again. And now our regular business has started coming back again,' he added. **The rebound is due in part to COVID-19 testing and antibody testing**."[4]

6. Defendant's scheme has also resulted in multiple complaints with the Better Business Bureau including the following:

> I was seen 7/11/20 for covid retest, which is advertised as free testing in this location. They billed my insurance 125office visit. This is false I completed a covid retest 7/11/20 at AFC URGENT care. There website, building, social media all say FREE COVID TESTING. They build my insurance $125 for an office evaluation. I was never seen by a doctor. I waited 4 hours in line with others, saw a TECH! I asked if I needed my doctors orders and was told no, she has me complete a questionnaire, took my temp, blood pressure, and swabbed me. And I left. I was not evaluated, or had medical history reviewed. They billed XXXXX not XXXXX. I disputed with them and they say that I was evaluated and that's how everyone is build with insurance. Stating that my insurance is self funded and didn't cover the covid test. Again, they advertise FREE testing. Do not say required insurance, did not say insurance would be billed, did not say anything. The office manager Michelle advised her supervisor waived the $25 portion I owe from the claim filed with my insurance BCBS. I spoke to my insurance separately and explained what I was seen for and was advised that the covid test would be

---

[4] https://sbdctampabay.com/urgent-care-business-resilient-during-pandemic/; (last accessed on Jan. 5, 2021).

free. I'm appalled because so many people are being taken advantage of. I work in healthcare and I know they're committing fraud. I have pictures from the day I was there and from there building and site. This is fraud![5]

7. In another complaint with the Better Business Bureau, a consumer who dupped by Defendant stated:

> In May of 2020, they were advertising free COVID-19 antibody testing. I just got a bill for $100 in August of 2020. UFC Urgent Care was advertising for FREE COVD-19 Antibody Testing in May of 2020. Before I went, I called to make sure it was actually free. I was told it was free. When I got there, I asked the receptionist again, if it was free. I was assured it was. Also, on my paperwork, I specifically wrote that I wanted to be inform of ANY charges before hand and that I don't agree to pay anything unless it is fully explained to me. Apparently, I have been charged for an Office Evaluation, which they decided comes to $100. I was never told about this. At some point, someone could and should have said to me, the test itself is free but you'll have to pay to talk to the Nurse Practitioner or just to come into the office. No one told me that. Had I been informed of that fee, I wouldn't have even done this test. $100 is not a small amount of money to me. I don't just have that lying around. I wasn't actively sick and didn't need urgent care. Since they had free tests, I figured I would just check and see if I had the antibodies, because I had been sick 2 months prior to going in. Anyway, my point is they falsely advertised and deliberately did not inform me that there would be a charge associated with this testing. They should have just been upfront about it, because I specifically asked. I'm leery about any medical testing, because they get to just send a large bill afterward and threaten to send it to collections if I can't pay. Hence, why I ask specifically if there's charges and write on my paperwork that I need to be informed before hand. I'm sure they've done this to other people too. And it's not right. I want this charge removed. And I don't

---

[5]  www.bbb.org/us/fl/pinellas-park/profile/urgent-care-clinic/afc-urgent-care-family-care-0653-90352182/complaints#0; (last accessed on July 8, 2021).

think they should get to charge anyone else for this. They falsely advertised. If they've collected money from anyone from their FREE testing, those people should get a refund.[6]

8. In sum, Defendant set out to capitalize on the pandemic and consumers' fears. In fact, so aggressive was Defendant's marketing that Defendant refused to honor Plaintiff's and the Class members' requests to be removed from its marketing campaigns. Defendant ignored those requests and kept bombarding Plaintiff and the Class members with texts advertising its "free" testing.

9. Through this action, Plaintiff seeks injunctive relief to halt Defendant's unlawful conduct. Plaintiff also seeks statutory damages on behalf of herself and the Class members, as defined below, and any other available legal or equitable remedies resulting from the illegal actions of Defendant.

## PARTIES

10. Plaintiff is, and at all times relevant hereto was, an individual and a "person" as defined by 47 U.S.C. § 153(39), a citizen and resident of Pinellas County, Florida, and the subscriber and/or sole user of the cellular telephone number 727-***-1111 (the "1111 Number").

11. Defendant is, and at all times relevant hereto was, a limited liability company and a "person" as defined by 47 U.S.C. § 153(39) that maintains its primary place of business and headquarters at 7101 US Highway 19 North, Pinellas Park,

---

[6] *Id.*

Florida 33781. Defendant directs, markets, and provides business activities throughout the State of Florida.

## JURISDICTION AND VENUE

12. Jurisdiction is proper under 28 U.S.C. § 1331 as Plaintiff alleges violations of a federal statute. Plaintiffs seek up to $1,500.00 in damages for each call in violation of the TCPA, which, when aggregated among a proposed class numbering in the tens of thousands, or more, exceeds the $5,000,000.00 threshold for federal court jurisdiction under the Class Action Fairness Act ("CAFA").

13. Venue is proper in the United States District Court for the District of Arizona pursuant to 28 U.S.C. §§ 1391(b) and (c) because Defendant is deemed to reside in any judicial district in which it is subject to the court's personal jurisdiction, and because Defendant provides and markets its services within this district thereby establishing sufficient contacts to subject it to personal jurisdiction.

## THE TCPA

14. The TCPA prohibits: (1) any person from calling a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent. 47 U.S.C. § 227(b)(1)(A).

15. The Federal Communications Commission ("FCC") is empowered to issue rules and regulations implementing the TCPA. According to the FCC's findings, calls in violation of the TCPA are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient. The FCC also

recognized that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used.

16. On March 20, 2020, the FCC issued a Declaratory Ruling regarding the COVID-19 pandemic. *See In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991,* CG Docket No. 02-278, DA 20-318 (Mar. 20, 2020) (the "FCC Order"). The FCC Order states that "[i]n determining whether a call relating to the COVID-19 pandemic qualifies as a call made for an emergency purpose, we look to the identity of the caller and content of the call." *Id.* at ¶7. The FCC Order further provides that "a call made by a county official to inform citizens of shelter-in-place requirements, quarantines, medically administered testing information, or school closures necessitated by the national emergency would be made for an emergency purpose as such measures are designed to inhibit the spread of the disease." *Id.* at ¶8. Similarly, "a call originating from a hospital that provides vital and time-sensitive health and safety information that citizens welcome, expect, and rely upon to make decisions to slow the spread of the COVID-19 disease would fall squarely within an emergency purpose." *Id.* The FCC Order also concluded that "calls that contain advertising or telemarketing of services do not constitute calls made for an 'emergency purpose'." *Id.* at ¶9. Such "advertising or telemarketing automated calls require the prior express consent of the called party." *Id.* at ¶10

## FACTS

17. On or about April 8, 2020, April 20, 2020, and May 1, 2020, Defendant sent the following text message solicitations to Plaintiff's 1111 Number:





18. The purpose of the messages was to advertise and promote Defendant's COVID-19 testing for which Defendant typically charges $130.00. As demonstrated by countless consumer complaints, Defendant's "free" testing offer was in fact a bait-and-switch scheme to lure consumers to Defendant's facilities, where they would have been forced to wait hours to only be told that their insurance did not provide coverage and they needed to pay for the testing, or that they owed a co-pay for the "free" test.

19. Defendant's text messages did <u>not</u> contain any information regarding shelter-in-place requirements, quarantines, free medically administered testing information, or school closures.

20. Defendant's text messages were <u>not</u> necessitated by the COVID-19 pandemic.

21. Defendant's text messages were <u>not</u> a reminder to confirm or refill a prescription order, schedule a prescription delivery, or confirm that a prescription is on its way.

22. It was not necessary for Defendant to send the text messages in order to protect the health or safety of Plaintiff, or any other recipient of the text message, as Plaintiff and the other recipients could have searched for available (and actually free) testing on their own.

23. Plaintiff received the subject text messages within this judicial district and, therefore, Defendant's violation of the TCPA occurred within this district.

24. Upon information and belief, Defendant caused similar text messages to be sent to individuals residing within this judicial district.

25. Plaintiff is the subscriber and/or sole user of the 1111 Number and is financially responsible for phone service to the 1111 Number. Plaintiff primarily uses the 1111 Number for residential purposes.

26. Plaintiff never provided Defendant with express written consent to contact her on the 1111 Number with automated text message solicitations as the verbiage on Defendant's patient registration form is inadequate.

27. To the extent that Defendant claims to secured consent, Plaintiff clearly and unequivocally revoked her consent when she repeatedly responded "Stop" in response to the messages as depicted in the above screenshots.

28. Defendant failed to honor or abide by Plaintiff's opt-out requests and continued to repeatedly text message Plaintiff after she asked for the messages to stop.

29. Defendant sent Plaintiff no less than three (3) text message solicitations *after* Plaintiff's initial stop request on April 8, 2020.

30. Pursuant to the FCC Order, Defendant's text messages were not for an emergency purpose because they contain advertising regarding Defendant's goods, products and/or services.

31. Defendant's failure to abide by Plaintiff's opt-out requests is indicative of Defendant's lack of a written policy for maintaining internal do not call procedures.

32. Defendant's failure to abide by Plaintiff's opt-out requests is indicative of Defendant's failure to institute procedures for maintaining a list of persons who request not to receive telemarketing calls.

33. Defendant's failure to abide by Plaintiff's opt-out requests is indicative of Defendant's failure to maintain an internal do not call list, as well as inform and train its personnel engaged in telemarking in the existence and the use of any internal do not call list.

34. Defendant's failure to abide by Plaintiff's opt-out requests demonstrates that Defendant does not record opt-out requests or place subscribers' names and telephone number on any do-not-call list at the time the requests are made.

35. Defendant's unsolicited calls caused Plaintiff to suffer injuries including annoyance and disruption to her daily life, as well as violation of Plaintiff's legal rights under the TCPA.

36. The unsolicited communications further harmed Plaintiff in that she wasted approximately 10-15 seconds reviewing and attempting to stop Defendant's text messages.

## CLASS ALLEGATIONS

### PROPOSED CLASS

37. Plaintiff brings this lawsuit as a class action on behalf of herself individually and on behalf of all other similarly situated persons as a class action pursuant to Florida Rule of Civil Procedure 1.220(b)(2) and (b)(3). The "Class" that Plaintiff seeks to represent is comprised of two classes and defined as:

> **Internal Do Not Call Class: All persons within the United States who, within the four years prior to the filing of this Complaint, (1) were sent a text message from Defendant or anyone on Defendant's behalf, (2) regarding Defendant's COVID-19 related services, (3) to said person's residential telephone number, (4) after making a request to Defendant to not receive future text messages, including, but not limited to, by replying "Stop" to Defendant's text messages.**

38. Defendant and its employees or agents are excluded from the Class. Plaintiff does not know the number of members in the Class but believes the Class members number in the several thousands, if not more.

### NUMEROSITY

39. Upon information and belief, Defendant has placed calls to cellular telephone numbers belonging to thousands of consumers. The members of the Class, therefore, are believed to be so numerous that joinder of all members is impracticable.

40. The exact number and identities of the Class members are unknown at this time and can be ascertained only through discovery. Identification of the Class members is a matter capable of ministerial determination from Defendant's call records, which contains the date, time, content, and recipient of each of Defendant's text message solicitations, as wells as inbound messages like Plaintiff's "Stop" requests.

### COMMON QUESTIONS OF LAW AND FACT

41. There are numerous questions of law and fact common to the Class which predominate over any questions affecting only individual members of the Class. Among the questions of law and fact common to the Class are: [1] Whether Defendant initiated telemarketing calls to telephone numbers; [2] Whether Defendant continued to text message individuals after they requested for the messages to stop; [3] Whether Defendant failed to properly maintain and internal do not call list and procedures; [4] Whether Defendant's conduct was knowing and willful; [5] Whether Defendant is liable for damages, and the amount of such damages; and [6] Whether Defendant should be enjoined from such conduct in the future.

42. The common questions in this case are capable of having common answers.  If Plaintiff's claim that Defendant routinely transmits unsolicited text messages to telephone is accurate, Plaintiff and the Class members will have identical claims capable of being efficiently adjudicated and administered in this case.

### TYPICALITY

43.     Plaintiff's claims are typical of the claims of the Class members, as they are all based on the same factual and legal theories.

### PROTECTING THE INTERESTS OF THE CLASS MEMBERS

44.     Plaintiff is a representative who will fully and adequately assert and protect the interests of the Class and has retained competent counsel. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

### SUPERIORITY

45.     A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Class are in the millions of dollars, the individual damages incurred by each member of the Class resulting from Defendant's wrongful conduct are too small to warrant the expense of individual lawsuits. The likelihood of individual Class members prosecuting their own separate claims is remote, and, even if every member of the Class could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.

46.     The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. For example, one court might enjoin Defendant from performing the challenged acts, whereas another may not. Additionally, individual

actions may be dispositive of the interests of the Class, although certain class members are not parties to such actions.

## COUNT I
## VIOLATION OF 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(d)
**(On Behalf of Plaintiff and the Internal Do Not Call Class)**

47.     Plaintiff re-alleges and incorporates the foregoing allegations set forth in paragraphs 1 through 46 as if fully set forth herein.

48.     In pertinent part, 47 C.F.R. § 64.1200(d) provides:

> No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:
>
> **(1)** *Written policy.* Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.
>
> **(2)** *Training of personnel engaged in telemarketing.* Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.

49.     Under 47 C.F.R § 64.1200(e), the rules set forth in 47 C.F.R. § 64.1200(d) are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers.

50.     Plaintiff and the Internal Do Not Call Class members made requests to Defendant not to receive calls from Defendant.

51.     Defendant failed to honor Plaintiff and the Internal Do Not Call Class members' opt-out requests.

52. Defendant's refusal to honor opt-out requests is indicative of Defendant's failure to implement a written policy for maintaining a do-not-call list and to train its personnel engaged in telemarketing on the existence and use of the do-not-call-list.

53. Thus, Defendant has violated 47 C.F.R. § 64.1200(d).

54. Pursuant to section 227(c)(5) of the TCPA, Plaintiff and the Internal Do Not Call Class members are entitled to an award of $500.00 in statutory damages, for each and every negligent violation.

47 As a result of Defendant's knowing or willful conduct, Plaintiff and the Internal Do Not Call Class members are entitled to an award of $1,500.00 in statutory damages per violation.

48 Plaintiff and the Internal Do Not Call Class members are also entitled to and seek injunctive relief prohibiting Defendant's illegal conduct in the future, pursuant to section 227(c)(5).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Linda Farhat, individually and on behalf of the Classes, prays for the following relief:

  a) An order certifying this case as a class action on behalf of the Classes as defined above, and appointing Plaintiff as the representative of the Classes and Plaintiff's counsel as Class Counsel;

  b) An award of actual and statutory damages for Plaintiff and each member of the Classes;

c) As a result of Defendant's negligent violations of 47 U.S.C. §§ 227, *et seq.*, and its implementing regulations, Plaintiff seeks for herself and each member of the Class $500.00 in statutory damages for each and every violation pursuant to 47 U.S.C. § 277(b)(3);

d) As a result of Defendant's knowing and/or willful violations of 47 U.S.C. §§ 227, *et seq.*, and its implementing regulations, Plaintiff seeks for herself and each member of the Classes treble damages, as provided by statute, up to $1,500.00 for each and every violation pursuant to 47 U.S.C. § 277(b)(3)(B) and § 277(b)(3)(C);

e) An order declaring that Defendant's actions, as set out above, violate the TCPA and its implementing regulations;

f) An injunction requiring Defendant to cease all unsolicited text messaging activity, and to otherwise protect the interests of the Classes;

g) An injunction prohibiting Defendant from using, or contracting the use of, an automatic telephone dialing system without obtaining, recipient's consent to receive calls made with such equipment;

h) An injunction requiring Defendant to cease all text messaging activity to individuals who have requested to be removed from Defendant's contact list;

i) A declaration that Defendant's practices described herein violate 47 C.F.R. § 64.1200(a)(1)(iii);

j) A declaration that Defendant's violations of 47 C.F.R. § 64.1200(a)(1)(iii) were willful and knowing; and

k) Such further and other relief as the Court deems necessary.

## JURY DEMAND

Plaintiff, individually and on behalf of the Class, hereby demand a trial by jury.

## DOCUMENT PRESERVATION DEMAND

Plaintiff demands that Defendant takes affirmative steps to preserve all records, lists, electronic databases or other itemization of telephone numbers associated with Defendant and the communication or transmittal of the text messages as alleged herein.

DATED: July 10, 2021

Respectfully Submitted,

**HIRALDO P.A.**

*/s/ Manuel S. Hiraldo*
Manuel S. Hiraldo, Esq.
Florida Bar No. 030380
401 E. Las Olas Boulevard
Suite 1400
Ft. Lauderdale, Florida 33301
Email: mhiraldo@hiraldolaw.com
Telephone: 954.400.4713

**EISENBAND LAW, P.A.**
Michael Eisenband
Florida Bar No. 94235
515 E. Las Olas Boulevard, Suite 120
Ft. Lauderdale, Florida 33301
MEisenband@Eisenbandlaw.com
Telephone: 954.533.4092